**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **HENRY CHRISTOPHER STUBBS, III,** | : | **CIVIL ACTION NO. 1:10-CV-1849** |
| | : | |
| **Petitioner** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **MICHAEL CURLEY, ATTORNEY** | : | |
| **GENERAL OF THE STATE OF** | : | |
| **PENNSYLVANIA**, | : | |
| | : | |
| **Respondents** | : | |

## MEMORANDUM

Petitioner Henry Christopher Stubbs, III ("petitioner"), a Pennsylvania state inmate, initiated this action with the filing of a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the following 2003 Court of Common Pleas of Luzerne County convictions: two counts of First-Degree Murder of Elena Herring ("Herring") and her six-year-old daughter Viktoria Ivanova ("Ivanova"); Rape; Burglary; two counts of Theft by Unlawful Taking or Disposition; Robbery; Persons Not to Possess, Use, Manufacture, Control, Sell or Transfer Firearms;  two counts of Access Device Fraud.   (Doc. 1; Doc. 21-8, at 1.)  In his petition, he raises a number of ineffective assistance of counsel claims, argues that the Commonwealth violated the dictates of Brady v. Maryland,373 U.S. 83 (1963), and asserts that the PCRA court's denial of relief constituted a due process violation.  (Doc. 1, at 7.)

For the reasons that follow, a *de novo* review will be conducted with respect to the "sink traps and washer trap" claim raised in petitioner's argument that counsel was ineffective in failing to present items of scientific value which would

have been helpful to his defense. (Doc. 1, at 68.) Relief will be denied as to all other claims.

## I. **Background & Procedural History**

The following comprises the "approximate account of the facts underlying Stubbs's conviction." (Doc. 21-8, at 2.)

> In December 2001, Herring and her daughter occupied a 'double-block' building in Wilkes-Barre, the other half of which was occupied at that time by Stubbs and his mother, Frances Guerrero. The evening of December 6, Stubbs complained to his girlfriend, Tammy Carroway, that he wanted money, and that he had seen some in Herring's house. He departed, and Carroway fell asleep. At approximately 1:30 A.M., Carroway testified, she awakened to the sound of Herring's and her daughter's voice; Herring sounded as though she was pleading for her life. Silence fell, and Carroway returned to sleep.

> Around 2:30 A.M., Carroway awakened and went looking for Stubbs. She went outside to Stubbs's car, and set off its alarm. She then saw Stubbs running from the direction of Herring's half of the building. He was carrying firearms wrapped in a blue blanket. He placed these in Herring's vehicle and drove off. The next morning at 7:30, Stubbs returned home and awakened Carroway. He left late on the evening of December 7.

> At approximately 9:30 P.M., concerns grew when Herring did not answer her phone. Herring's brother-in-law went to her home, retrieved a hidden key, and entered the apartment. Inside, he found Herring's dead body lying on the living room floor. He found Herring's daughter's dead body hanging by the neck from the basement ceiling.

> At approximately 11:00 P.M., Stubbs picked up another girlfriend, Tawanda Maddox, in Philadelphia. He immediately drove her and her children back to Wilkes-Barre, arriving at approximately 3:00 A.M. on December 8. When they arrived at Maddox's apartment she overheard

Stubbs tell his brother-in-law that someone had been killed on Stubbs's mother's block.  He carried into Maddox's apartment items wrapped in a blue blanket.  Next, Maddox escorted Stubbs to another location, where he moved a gold vehicle.  Eventually, they went to a local hotel; Stubbs still had possession of the blue blanket and its contents.  A few days later, on December 12, Stubbs was apprehended by Philadelphia police on a warrant unrelated to the above-related events.   Wilkes-Barre detectives drove to Philadelphia to interrogate Stubbs and then escorted him back to Wilkes-Barre.

Expert testimony established that both Herring and her daughter were killed by ligature strangulation, Herring by a shoe lace and Ivanova by hanging.  Ivanova also suffered blunt-force traumas to the face.  Herring had been raped at approximately the same time as she had been killed.  Genetic evidence indicated that Stubbs had had recent sexual contact with Herring.  He conceded that contact, but contended that it had been consensual, and that he and Herring, who was married, had been carrying on a discreet relationship.  The jury found Stubbs guilty of two counts of first-degree murder, and various related charges.  When the jury failed to impose the death penalty, the trial court sentenced Stubbs to two life sentences for the murders of Herring and Ivanova.  On a later date, the court imposed sentences on the other charges.

(Doc. 21-8, at 2-4.)

Stubbs filed a timely post-trial motion, which was denied on February 26, 2004. (Doc. 21-4.)  A timely notice of appeal to the Superior Court of Pennsylvania was filed raising issues pertaining to pre-trial matters of voir dire, the trial court's refusal to change venue due to pre-trial publicity, the trial court's refusal to sequester the jurors to the extent Stubbs requested, and the admissibility and sufficiency of the evidence.  (Doc. 21-8, at 4-5.)  On April 4, 2005, the judgment of sentence was affirmed.  (Id. at 30.)  A petition for allowance of appeal was filed in

the Supreme Court of Pennsylvania.  (Doc. 21-9).  It was denied on December 12, 2005.  (Doc. 21-10, at 4; Commonwealth v. Stubbs, 876 A.2d 470 (Pa. Super. 2005 (unpublished memorandum), appeal denied, 586 Pa. 726, 890 A.2d 1058 (2002).) Thereafter, Stubbs filed a petition for writ of certiorari with the Supreme Court of the United States, which was denied on May 22, 2006.  (Doc. 21-10; Stubbs v. Pennsylvania, 547 U.S. 1152 (2006).)

On May 17, 2007, Stubbs filed a Motion for Post Conviction Collateral Relief under Pennsylvania's Post Conviction Relief Act (PCRA), 42 Pa. C.S.A. § 9541 *et. seq.*  (Doc. 21-11.)  An evidentiary haring was held and, on November 29, 2007, PCRA relief was denied.  (Doc. 21-16, at 7.)  A timely appeal was filed raising four grounds of ineffective assistance of counsel, a claim that his due process rights were violated when the Commonwealth suppressed evidence favorable to the defense in contravention of Brady v. Maryland, 373 U.S. 83 (1963) claim, and a claim that the PCRA court's denial of relief was an abuse of discretion that violated due process. (Doc. 21-16, at 7, 9.)  The superior court affirmed the PCRA court's Order denying relief on March 24, 2010.  No further review was sought.

On September 2, 2010, the instant petition for writ of habeas corpus was filed seeking relief on the following grounds:

> 1.  Whether trial counsel provided effective assistance of counsel under the federal Constitution where counsel failed to:
>
>> A)  challenge the Commonwealth's misrepresentation of DNA evidence;

4

B)   challenge the Commonwealth's
     misrepresentation of material
     evidence;

C)   present evidence of scientific
     relevance which would have been
     helpful to the defense;

D)   object to prosecutor's improper
     comment during closing arguments.

2.   Whether the Commonwealth violated the dictates
     of Brady vs. Maryland by withholding the fugitive
     felony arrest warrant of one of its witnesses.

3.   Whether the PCRA court's denial of (PCRA) relief
     is an abuse of discretion that violates due process.

(Doc. 1, at 7.)

## II.   Standards of Review

A habeas corpus petition pursuant to 28 U.S.C. § 2254 is the proper

mechanism for a prisoner to challenge the "fact or duration" of his confinement.

Preiser v. Rodriguez, 411 U.S. 475, 498-499 (1973).  "[I]t is not the province of a

federal habeas court to reexamine state-court determinations on state-law

questions."  Estelle v. McGuire, 502 U.S. 62, 67-8 (1991).  Rather, federal habeas

review is restricted to claims based "on the ground that [petitioner] is in custody in

violation of the Constitution or laws or treaties of the United States."  28 U.S.C.

§ 2254(a); Estelle, 502 U.S. at 67-8; see also Pulley v. Harris, 465 U.S. 37, 41 (1984);

Johnson v. Rosemeyer, 117 F.3d 104 (3d Cir. 1997).

Before a federal court can review the merits of a state prisoner's habeas

petition, it must determine whether the petitioner has met the requirements of

exhaustion.  Relief cannot be granted unless all available state remedies have been exhausted, or there is an absence of available state corrective process, or circumstances exist that render such process ineffective to protect the rights of the applicant.  See 28 U.S.C. § 2254(b)(1).  The exhaustion requirement is grounded on principles of comity in order to ensure that state courts have the initial opportunity to review federal constitutional challenges to state convictions.  See Werts v. Vaughn, 228 F.3d 178, 192 (3d Cir. 2000).  In the case at hand, it is undisputed that the issues raised by petitioner have been fully exhausted.

Once a court is satisfied that the exhaustion requirement has been met, and a merits review of a claim is warranted, as is the case here, section 2254(d) of Title 28 of the United States Code provides, in pertinent part, that an application for a writ of habeas corpus premised on a claim previously adjudicated on the merits shall not be granted unless the decision is contrary to, or involves an unreasonable application of, clearly established federal law, or is based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).  AEDPA thus limits a federal court's authority to grant habeas relief when a state court has previously considered and rejected the federal claim on the merits.

The United States Court of Appeals for the Third Circuit recently set forth the following analyses applicable to the three legal inquiries:

> Consistent with Supreme Court precedent, we read § 2254(d) to require three distinct legal inquiries.  See, e.g., Harrington v. Richter, --- U.S. ---, 131 S. Ct. 770, 785 (2011).  The first is whether the state court decision was

6

"contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1). The second is whether the state court decision "involved an unreasonable application of" such law. § 2254(d)(1). And the third is whether the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented" to the state court. § 2254(d)(2).

The test for § 2254(d)(1)"s "unreasonable application of" clause is as follows: "[a]n 'unreasonable application' occurs when a state court 'identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts' of petitioner's case." Rompilla v. Beard, 545 U.S. 374, 380 (2005) (quoting Wiggins v. Smith, 539 U.S. 519, 520 (2003)). For purposes of § 2254(d)(1), "[i]t is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous." Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (internal quotations omitted). "Under § 2254(d)(1)'s 'unreasonable application' clause . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 75-76 (quoting Williams v. Taylor, 529 U.S. 362, 411 (2000)). Rather, "[t]he state court's application of clearly established law must be objectively unreasonable" before a federal court may grant the writ. Andrade, 538 U.S. at 75.

The test for § 2254(d)(1)'s "contrary to" clause is whether the state court decision "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme] Court but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405, and Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002)). Of course, a state court's resolution of a question that the Supreme Court has not resolved can be neither contrary to, nor an unreasonable application of, the Court's precedent. See Kane v. Garcia Espitia, 546 U.S. 9 (2005).

The test for § 2254(d)(2)'s "unreasonable determination of facts" clause is whether the petitioner has demonstrated by "clear and convincing evidence," § 2254(e)(1), that the state court's determination of the facts was unreasonable in light of the record. See Rice v. Collins, 546 U.S. 333, 338-339 (2006) ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'") (quoting § 2254(e)(1)) (citing Miller-El

v. Dretke, 545 U.S. 231, 240 (2005))); see also Simmons v. Beard, 590 F.3d
223, 231 (3d Cir. 2009) ("Under the § 2254 standard, a district court is
bound to presume that the state court's factual findings are correct, with
the burden on the petitioner to rebut those findings by clear and
convincing evidence.").   Importantly, the evidence against which a
federal court measures the reasonableness of the state court's factual
findings is the record evidence at the time of the state court's
adjudication.   Cullen v. Pinholster, --- U.S. ---, 2011 WL 1225705, at *11
(Apr. 4,  2011).

Rountree v. Balicki, 640 F.3d 530, 537-38 (3d Cir. 2011).  Like the "unreasonable

application" prong of paragraph (1), a factual determination should be adjudged

"unreasonable" under paragraph (2) only if the court finds that a rational jurist

could not reach the same finding on the basis of the evidence in the record.  28

U.S.C. § 2254(d)(2); Porter v. Horn, 276 F. Supp. 2d 278, 296 (E.D. Pa. 2003); see also

Torres v. Prunty, 223 F.3d 1103, 1107-08 (9th Cir. 2000); cf. Jackson v. Virginia, 443

U.S. 307, 316 (1979).  Only when the finding lacks evidentiary support in the state

court record, or is plainly controverted by the evidence, should the federal habeas

court overturn a state court's factual determination.  Porter, 276 F. Supp. 2d at 296;

see also Williams, 529 U.S. at 408-09.

Significantly, the AEDPA precludes habeas relief on a "claim that was

adjudicated on the merits in State court proceedings" unless the petitioner has

shown that the state court proceedings "resulted in a decision that was contrary to,

or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States; or . . . resulted in a decision

that was based on an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).  By its own

terms, § 2254(d) applies only to claims already "adjudicated on the merits in State court proceedings."  If the court determines that the state courts have not reached the merits of the claim, the deferential standards provided by AEDPA do not apply. See Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001).  "In such an instance, the federal habeas court must conduct a *de novo* review over pure legal questions and mixed question of law and fact, as a court would have done prior to the enactment of the AEDPA."  Id. (citing McCandless v. Vaughn, 172 F.3d 255, 260 (3d Cir. 1999).

The merits of the claims presented by petitioner will now be analyzed in accordance with these standards.

## III.   Discussion

### A.      Ineffective Assistance of Trial Counsel

Petitioner argues that he was provided ineffective assistance when counsel failed to challenge the Commonwealth's misrepresentation of DNA evidence, failed to challenge the Commonwealth's  misrepresentation of material evidence, failed to present scientifically relevant evidence, and failed to object to an improper comment made by the prosecution during closing arguments.  These claims are governed by the standard set forth in Strickland v. Washington, 466 U.S. 668 (1984), which constitutes "clearly established Federal law" for AEDPA purposes.  Williams v. Taylor, 529 U.S. 362, 391 (2000); Rainey v. Varner, 603 F.3d 189, 197 (3d Cir. 2010). A habeas petitioner asserting a claim under Strickland must establish two elements.  "First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel

was not functioning as the 'counsel' guaranteed the defendant by the Sixth
Amendment." <u>Strickland</u>, 466 U.S. at 687.  In evaluating counsel's performance, "a
court must indulge a strong presumption that counsel's conduct falls within the
wide range of reasonable professional assistance[.]" <u>Id.</u> at 689.  Thus, counsel's
performance will be deemed deficient only if it "fell below an objective standard of
reasonableness." <u>Id.</u> at 688.  The question ultimately is "whether, in light of all the
circumstances, the [challenged] acts or omissions were outside the wide range of
professionally competent assistance." <u>Id.</u> at 690.

"Second, the [petitioner] must show that the deficient performance
prejudiced the defense.  This requires showing that counsel's errors were so serious
as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." <u>Id.</u> at
687.  To establish prejudice, "[t]he [petitioner] must show that there is a reasonable
probability that, but for counsel's unprofessional errors, the result of the proceeding
would have been different.  A reasonable probability is a probability sufficient to
undermine confidence in the outcome." <u>Id.</u> at 694.

     1.   <u>Pre-AEDPA review</u>

Under the heading "Argument C) counsel's failure to present items of
scientific value which would have been helpful to petitioner's defense" Stubbs
includes a claim under the subheading "sink traps and washer trap"  (Doc. 1, at 53,
68) that, for the reasons set forth below, is subject to Pre-AEDPA *de novo* review.

The PCRA court framed the issue as follows:[1]

> Appellant's next subheading is entitled 'Sink traps, washer trap and gloves'.  In this context Appellant apparently claims Trial Counsel was ineffective in not challenging the Commonwealth's contention the Appellant washed a green sweater worn during the killings. It is noted that sink traps and contents from the kitchen and bathroom of the victim's residence, as well as the Appellant's gloves tested 'negative for the presence of blood'. " (Doc 21-13, at 16.)  This issue was addressed as [sic] pages 59 through 61 of the PCRA transcript.  In response, Trial Counsel stated:

> > Yeah, what he's referring to is in the closing argument, I believe, Attorney Lupas was eluding to the testimony of Tammy Carroway where she indicated sometime that morning Henry had come to her, insisted that she take this green sweater, that they put it in the wash and that she wash it, and that Henry on all prior occasions had usually sent the sweater out for dry cleaning but this time he was addiment (sic) that he wanted it washed. She related to him the fact that she couldn't throw it in with the white clothes she was washing.  He wanted it thrown in anyway.

> > From that, Lupas was arguing an inference.  The reason Henry wanted the sweater washed that morning was because he was concerned there may be blood on it.  That's not to say necessarily there was blood on it.  In fact, the Prosecution in their case never presented any evidence in particular that, in fact, there was blood actually found on the sweater.  Their theory was if there was any blood on it, Henry put it in the washing machine to ensure that was eliminated.  That's where Mr. Lupas was coming from, and, I think, it was fair argument.
> > (PCRA N.T. pages 60-61).

---

[1]On appeal from the PCRA court, the Pennsylvania Superior Court adopted the PCRA court's reasoning as if fully restated therein and affirmed on the basis of the PCRA court's opinion with regard to each of Appellant's allegations in support of PCRA relief.  (Doc. 21-16, at 9.)  Consequently, the PCRA court's opinion will be the primary reference point in addressing this issue and all subsequent issues.

> We have reviewed then District Attorney Lupas' argument at pages 2269 through 2337 of the trial transcript. During the closing Mr. Lupas references the testimony of a Commonwealth witness, Tammy Carroway, establishing Mr. Stubbs demanded the green sweater be washed. . . .
>
> A prosecutor is permitted to respond to defense arguments with logical force and vigor. Commonwealth v. Judy, 978 A.2d 1015 (Pa. Super. 2009). Further a prosecutor may argue all reasonable inferences that find support in the evidence. Commonwealth v. Rios, 920 A.2d 790 (2007). A prosecutor may make any argument based upon the evidence as to the nature of the crime. A prosecutor may urge the jury to draw any inference that is reasonably supported by the evidence. Id., 920 A.2d at 808. We find the District Attorney's comment in no way improper and therefore Appellant's ineffectiveness claim fails.

(Doc. 21-13, at 16-16.) Stubbs argues that "[t]he PCRA court completely misconstrued this issue and analyzed it as if Petitioner had raised a prosecution improper comment claim stemming from closing argument. See PCRA courts [sic] opinion at pages 15-17. Therefore, the PCRA court failed to address the merits of Petitioner's claim where Petitioner clearly argue[d] trial counsel's ineffectiveness due to counsel's failures to present scientific evidence, e.g., sink traps and washer trap, which held the principles to prove that Petitioner did not wash any crime scene blood from his hands or any other evidence. The state court's failure to find ineffective assistance of counsel on this claim resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." (Doc. 1, at 68.) He further states that his "claim on appeal was not then nor is it now based on the Commonwealth establishing that blood was 'found' on his clothing or property, because there was never any blood connecting petitioner to the crime(s)." (Id. at 72.) He is challenging "the

Commonwealth 'establishing' the presumption' that petitioner washed blood evidence away, and trial counsel's failure to present the scientific evidence and conclusion in a defense effort to disarm that presumption." (Id.)   Stubbs argues that the state courts failure to address trial counsel's effectiveness in the context of his failure to present scientific evidence concerning the lack of blood in the sink traps and washer trap requires this Court to conduct a *de novo* review of the issue based on the following:

> The Petitioner must reiterate that; this claim is not based on the Petitioner's blood, or ineffective counsel for failing to challenge an improper comment by the prosecutor. As this Court will note, should it conduct its required de novo review; the Petitioner has preserved this claim repeatedly to challenge trial counsel's ineffectiveness for his failure to present sink traps, and washing machine trap evidence as a defense strategy to challenge the prosecutions [sic] evidence which suggested to the jury that Petitioner washed Viktoria Ivanova's blood from his hand(s), see (Petitioner's Habeas Corpus, pg. 43), and (PCRA hearing, pp. 51-54); and the prosecutions [sic] evidence which suggested to the jury that Petitioner washed Vicktoria Ivanova (the child victims [sic]) blood from his sweater, see (Petitioner's Habeas Corpus, pg. 44), and (PCRA hearing, pp. 51-54).

(Doc. 22, at 20.) (punctuation in original).

Respondents do not address whether the claim is subject to *de novo* review. Rather they take the position that counsel's decision not to make any further arguments regarding blood was reasonable because the Commonwealth was unable to present evidence indicating the presence of petitioner's blood. (Doc. 18-1, at 9-10, citing N.T. PCRA Hearing pp. 51-54.)

The Court agrees with Mr. Stubbs' position that the claim is subject to *de novo* review based on the state courts' failure to address the merits of the claim.

13

The issue will require further briefing and expansion of the record.   See R.

Governing § 2254 Cases R. 7(a).   After submission and review of these materials,

the court will determine whether an evidentiary hearing is warranted.   Id. at 8(a).

    2.    AEDPA Review

The remaining ineffective assistance of counsel claims were addressed by the

state courts on the merits and, therefore, are subject to AEDPA review.

    a.    Whether the State Court Decision was Contrary to the
Strickland Standard Set Forth by the United States
Supreme Court

Under the "contrary to" clause, we must determine whether the state court

applied a rule that contradicts Strickland or was confronted with a set of facts

materially indistinguishable from a decision of the United States Supreme Court

but reached a different result.

    *i.*    *Whether the state court applied a rule that*
*contradicts Strickland*

Each of Mr. Stubbs' ineffective assistance of counsel issues contained in the

petition was raised during the PCRA proceedings.   The Superior Court's recitation

of the Pennsylvania standard for ineffective assistance set forth below, is essentially

identical to the test enunciated in Strickland:

> In order to succeed on a claim of ineffective assistance of counsel, an appellant must demonstrate (1) that the underlying claim is of arguable merit; (2) that counsel's performance lacked a reasonable basis; and (3) that counsel's ineffectiveness worked to his prejudice. Commonwealth v. Pierce, 567 Pa. 186, 203, 786 A.2d 203, 213 (2001). Prejudice requires proof that there is a reasonable probability that, but for counsel's error, the outcome of the proceeding would have been different. Id. When it is

> clear that appellant has failed to meet the prejudice prong of his
> ineffective assistance of counsel claim, the claim may be disposed on that
> basis alone, without a determination of whether the first two prongs have
> been met. <u>Commonwealth v. Baker</u>, 880 A.2d 654, 656 (Pa. Super. 2005).

(Doc. 21-16, at pp. 8-9).  <u>See</u> <u>Werts v. Vaughn</u>, 228 F.3d 178, 203 (3d Cir. 2000).

Significantly, the Superior Court fully adopted the PCRA court's reasoning and

affirmed on the basis of that court's opinion with regard to each of the claims raised

in the PCRA petition.  (Doc. 21-16, at 9.)  Review of the PCRA opinion reveals that

the standards relied upon by the PCRA court also mirror the <u>Strickland</u> standard of

review.  (Doc. 21-13, at 6-8.)  An examination of the arguable merit of an underlying

claim is not an explicit step under <u>Strickland</u>, but the United States Court of

Appeals for the Third Circuit has held that such a step is not in conflict with

<u>Strickland</u>.  <u>Rompilla v. Horn</u>, 355 F.3d 233, 248 n. 9 (3d Cir. 2004), reversed on other

grounds, <u>Rompilla v. Beard</u>, 545 U.S. 374 (2005).  To the contrary, it is considered a

determinative factor in the "deficient performance" prong of the <u>Strickland</u>

analysis.  <u>See</u> <u>Werts</u>, 228 F.3d at 203-04; <u>Parrish v. Fulcomer</u>, 150 F.3d 326, 328 (3d

Cir. 1998) (counsel not ineffective for failing to raise meritless claims).  Hence, the

state courts did not apply a rule of law that contradicts <u>Strickland</u>.

  ii. *Whether the state court was confronted with a set of facts materially indistinguishable from a decision of the United States Supreme Court but reached a different result*

  a. Material Evidence Claim

Petitioner argues that the PCRA court "decided this case differently from how the U.S. Supreme Court has decided cases with materially indistinguishable facts" with regard to his "material evidence" claim. (Doc. 1, at 52.) The PCRA court's findings concerning this issue were adopted by the superior court, and are as follows:

> The second allegation of ineffective assistance suggests that the Commonwealth misrepresented material evidence regarding Tammy Carroway and her observation of the Defendant "adorning a black knit ski mask as the Defendant made an exit from the residence of Mrs. Herring." When questioned regarding the black knit hat Atty. Flora agreed that the property custody re ports do not mention a 'black knit ski hat'. Atty. Flora further agreed that the forensic scientist used the words 'black knit hat' on a submitted report. (PCRA N.T. page 36). When asked about an alleged discrepancy in the property custody records and whether that could have been part of the defense Atty. Flora responded "No, Henry, because whether it's called a black knit ski cap or a black knit cap it still doesn't exclude you from being in the house on or about the same time this homicide- -"at which point Appellant objected, the Court overruled the objection and Appellant posed an additional question before Atty. Flora finished his response. (PCRA N.T. page 37). Appellant argued a Commonwealth witness, Detective Robert Zavada, perjured himself when the detective stated he found a black ski mask inside the pocket of a black leather jacket Defendant was wearing at the time of his arrest on December 12, 2001 in the City of Philadelphia. Appellant argues that a search of the half of the double block occupied by Defendant yielded two black knit caps.

In response Atty. Flora indicated:

> My recollection is that there was some testimony relating to
> a hat that was found in your coats at the time of your arrest.
> That was identified. There's some testimony that there was,
> I think, something else found up in Wilkes-Barre, something
> like that. There was disputes, I think, as to what was found.
> The fact of the matter is no matter - - the fact of the matter
> is, Henry, is that it doesn't eliminate you from being in the
> house. That's the problem we had in this case. How do we
> eliminate you from being in the house on or about exact
> time of the homicide.
> (PCRA N.T. pages 39, 40).

Appellant suggested the black knit ski cap line of questions,
posited in the PCRA context, would have discredited Tammy Carroway's
testimony regarding her observations of the Defendant. At this point
during the hearing the Trial Court interjected 'Mr. Flora told you and
he's tried to explain to you that it is your statement that puts you at the
house. Whether you're wearing a hat, a black or an orange hat, you put
yourself at the house, and that's his point to you. Now, I don't
understand ineffective assistance of counsel in this line of questioning.'
(PCRA N.T. pages 40, 41).

Appellant has again failed to demonstrate how this claim is not
waived. Additionally, as articulated by the Trial Judge in the quoted
passage, the claim lacks arguable merit. Further, Appellant has not
demonstrated in any meaningful way how the result of the proceeding
would have been different should this line of questioning been pursued.
Even if the Court assumes Trial Counsel could have made a point
regarding the black knit hat Appellant has miserably failed to
demonstrate prejudice.

(Doc. 21-13, at 10-11.)

Stubbs specifically argues that he suffered prejudice as a result of trial

counsel's deficient performance in failing to properly cross-examine prosecution

witnesses Carroway and Zavada, both of whom "plac[ed] a ski mask, (a burglary

17

tool), on [his] head. . . ."[2]  (Doc. 1 at 52; Doc. 22, at 10-12.)  He asserts that "[h]ad

counsel exposed the Commonwealth's deceptive tactics of tampering with this

evidence [through cross-examination], there's a reasonable probability that the jury

would have lacked confidence in the Commonwealth's case and would have been

able to reach reasonable doubt. '. . . A court making the prejudice inquiry must ask

if the defendant has met the burden of showing that the decision reached would

reasonably likely have been different absent the errors.'  Strickland v. Washington,

104 S.Ct. at 2069."  (Doc. 1, at 52.)

He cites to various federal cases in support of his position that the state court

decisions differ from Supreme Court cases with materially indistinguishable facts.

However, review of the cases, each of which involves trial counsel's failure to

properly cross-examine prosecution witnesses, *inter alia*,  reveals that they  are

factually distinguishable.[3]  For instance, in the matter of Matthews v. Abramajtys,

92 F. Supp.2d 615 (E.D. Mich 2000)[4], the key issue was proper identification of the

petitioner as one of the perpetrators in the robbery and murder of three individuals.

---

[2]Tammy Carroway, testified that "she witnessed petitioner wearing a black ski type hat." (Doc. 1, at 44.)  Robert Zavada testified that petitioner had a black knit ski cap in the pocket of his black leather jacket at the time of his arrest. (Doc. 1, at 46-47, 52.)

[3]One of the cases cited by petitioner, Callahan v. Haley, 313 F.Supp.2d (N.D. Ala 2004), was vacated by Callahan v. Campbell, 427 F.3d 897 (11th Cir. 2005).  As a result, no further discussion of the case is warranted.

[4] Matthews v. Abramajtys, 319 F.3d 780 (2003), was affirmed in part and vacated in part on appeal.  The finding that counsel was ineffective was affirmed. Id. at 789-90.

Id. at 635.  Six child witnesses, ages eight through twelve, testified that they heard gunshots and saw three males running in the neighborhood one or two blocks from the crime scene.  Id.  None of the children could identify the three males.  Id.  However, four of them stated that one of the males wore a Georgetown jacket.  Id.  Two identified the jacket as grey in color and two others described the jacket as gray and blue.  Id. at 636.  One of the four stated in a pre-trial statement that the jacket was silver in color with black letters.  Id. at 636.  The prosecution introduced a mug shot of the petitioner wearing a blue Georgetown jacket with gray lettering which was admitted over defense objection.  Id.  Trial counsel did not cross-examine or recall any of the child witnesses to determine the color of the jacket or attempt to resolve the discrepancies in their descriptions of the jacket.  Nor did he discuss any of the discrepancies in his closing argument.  Id.  Trial counsel also failed to elicit testimony from the child witnesses concerning their descriptions of the physical size of the perpetrators.  Id.  In response to questioning by the trial judge, one witness described the fleeing males as older than himself and indicated that two were the size of men and one was the size of a teenager.  Id.  Another witness gave physical descriptions of the men in a pre-trial statement.  Id.  It was concluded that, given the lack of physical evidence linking the petitioner to the charged offenses, and the importance of the identification testimony, counsel's failure to cross-examine the child witnesses about their descriptions of the fleeing men was inexcusable and unsound trial strategy.  Id.  The court found that trial

counsel was deficient and that such deficient performance prejudiced the defendant.

Matthews is clearly distinguishable.  Stubbs contends that trial counsel's failure to challenge the testimony that he was wearing a black knit ski mask versus a black knit hat, made him appear as though he favored an article of clothing that doubled as a "burglary tool."  In the instant matter, there was no confusion or issue concerning his identity and it was undisputed that he was present at the crime scene immediately prior to the murders.

The cases of Groseclose v. Bell, 130 F.3d 1161 (6th Cir. 1997), Jemison v. Foltz, 672 F.Supp. 1002 (ED.Mich.,1987), and Fisher v. Gibson, 282 F.3d 1283 (10th Cir. 2002) are distinguishable in that defense counsel failed to advocate on behalf of their clients at critical stages in the proceedings and lacked any meaningful trial strategy.  (Doc. 1, at 52.)  In Groseclose, the court found that counsel failed to conduct any meaningful adversarial challenge by failing:   (1) to cross-examine more than half of the prosecution's witnesses, (2) to object to any evidence, (3) to put on any defense witnesses, (4) to make a closing argument and, at sentencing, (5) to put on any meaningful mitigation evidence.  Id. at 1169  In addition, at the state court PCRA hearing, Groseclose counsel testified that "he simply *had* no strategy."  Id. at 1170 (emphasis in original).  In Jemison, the court concluded that counsel did not even approximate the standards set forth in Strickland.  Jemison, 672 F.Supp. at 1007.  Counsel waived the preliminary examination.  No motions were filed.  Counsel made neither an opening statement nor a closing argument.

20

Counsel failed to interview a potentially effective alibi witness, even though the witness had called counsel's office on two separate occasions to advise him of her availability, and petitioner had emphasized to counsel the importance of this witness.  A jury trial was waived.  Counsel allowed the petitioner to take the stand in his own defense, which allowed for the admissibility of petitioner's long criminal record.  Defense counsel's cross-examination of the state's only witness was highly limited and ineffectual.  (Id. at 1007-08).

Stubbs cites Fisher in support of his argument that "[t]rial counsel's failure to present available police reports to expose detective Zavadas' perjured testimony, and his failure to present the above lab reports and results thereof 'fell below and objective standard of reasonableness.'"  (Doc. 1, at 51.)   Unlike the instant case, the Fisher trial transcript reveals that Mr. Porter, trial counsel, unwittingly elicited damaging testimony and frequently reiterated damaging testimony or evidence that defense counsel must have known would harm his client's case.  Fisher, 282 F.3d at 1298.  "Not only did Mr. Porter pursue these actions without any apparent strategy, he also exhibited hostility to his client and sympathy and agreement with the prosecution in ways that put his actions directly at odds with his client's interests. Some of these actions constitute such ineptitude or lack of diligence they amount to objectively deficient advocacy on the part of Mr. Porter."  Id.

Based on the foregoing, Stubbs' claim of deficient assistance of counsel, indistinguishable from prior findings of deficiencies by the United States Supreme Court, is without merit and will be denied.

21

b.        Improper Comments by the Prosecutor

He also argues that, in considering whether trial counsel was ineffective for failing to object to improper comments made by the prosecutor during his closing argument, the state courts were confronted with facts that are materially indistinguishable from decisions of the Supreme Court of the United States, but arrived at a different result.  (Doc. 1, at 76, Doc. 22, at 25.)

He relies on the case of Berger v. United States, 295 U.S. 78, 84 (1935), in support of the principle that a lawyer may not knowingly assert a fact which has not been proven.  (Doc. 22, at 24.)  In Berger, it was found that the prosecuting attorney overstepped the bounds of propriety and fairness on repeated occasions by "misstating the facts in his cross-examination of witnesses; of putting into the mouths of such witnesses things they had not said; of suggesting by his questions that statement had been made to him personally out of court, in respect of which no proof was offered; of pretending to understand that a witness had said something which he had not said and persistently cross-examining the witness upon that basis; of assuming prejudicial facts not in evidence; of bullying and arguing with witnesses; and, in general, of conducting himself in a thoroughly indecorous and improper manner."  Berger, 295 U.S. at 84.  Berger was not "a case where the misconduct of the prosecuting attorney was slight or confined to one single instance, but one where such misconduct was pronounced and persistent with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential."  Id. at 89.  However, Berger is distinguishable because there is

simply no discussion concerning the actions taken by Berger's trial counsel in response to the prosecutor's comments, and the issue of whether trial counsel was ineffective in his manner of handling the prosecutor's inappropriate conduct was not raised.

Moreover, when a prosecutor's opening or closing remarks are challenged in habeas, "[t]he relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). The improper comments Stubbs challenges are quoted as follows: " 'What else did he do? He was hiding outside the hotel. You heard the story how they were hiding behind the bushes when the police came. He was hiding out. And then where did they go after hiding in the bushes? And how did they get to Tracy Weavers in Mineral Springs? They walked along railroad tracks, through ditches. They didn't walk on the roads because he didn't want to get caught because he had stolen guns with him and the bodies were now discovered.' (N.T. 2304-05)." (Doc. 1, at 76-77.)

> During the PCRA hearing, the following exchange took place:
>
> The Court:   Any other issues or any other comments you think were inappropriate?
>
> Mr. Stubbs:  Yes, Your Honor. The Commonwealth also stated that Mr. Stubbs was avoiding walking on roads because Mr. Stubbs didn't want to get caught with stolen guns in his possession while the victims were then discovered, and that wasn't objected to. And at the time - - during that period that the Commonwealth suggested, Mr. Stubbs did not have any guns on his possession whatsoever.

> Mr. Flora:    It's my position, Your Honor, that Mr. Lupas' argument was fair based upon the evidence that was presented in that case.  You had a situation here where Mr. Stubbs admits taking the guns from the house. The only question is, What circumstances did he take the guns?  He was out and about in the Wilkes-Barre area.  He was hiding the guns.  He was going from, I think, a motel room to his sister's house and different places.  So Mr. Lupas's argument was fair and reasonable under the circumstances.

(Doc. 21-12, at 17.)  The PCRA court reviewed the district attorney's closing argument in context by examining the pertinent Notes of Testimony and considered PCRA trial counsel's testimony that he did not object because he thought the argument made by the prosecutor was fair and reasonable based upon the evidence that was presented.  This review lead to the conclusion that the claim lacked arguable merit.  (Doc. 21-13, at 19.)

The state courts were quite clearly guided by  Supreme Court precedent which directs the reviewing court to examine the prosecutor's offensive actions in context, Moore v. Morton, 255 F.3d 95, 107 (3d Cir. 2001).  Here, the court was simply not convinced that the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Donnelly, 416 U.S. at 643.  This review comports with federal standards, and the state court's determination that counsel was not ineffective for failing to object to the prosecutor's comments is not contrary to Supreme Court precedent.

b.    Whether the State Court Determinations Involved an
Unreasonable Application of <u>Strickland</u>

The United States Supreme Court has recently stated that "[t]he pivotal

question is whether the state court's application of the <u>Strickland</u> standard was

unreasonable.  This is different from asking whether defense counsel's performance

fell below <u>Strickland's</u> standard."  <u>Harrington v. Richter</u>, — U.S. — , 131 S.Ct. 770

(2011).  The Court further stated "that habeas corpus is a guard against extreme

malfunctions in the state criminal justice systems, not a substitute for ordinary

error correction through appeal" and reiterated that even under de novo review,

the standard for judging counsel's representation is a most deferential one; the

question is whether an attorney's representation amounted to incompetence under

prevailing professional norms.  <u>Id.</u> at 786, 788 (quoting <u>Strickland</u>, 466 U.S. at 690.)

i.    *DNA[5] Evidence*

Petitioner argues that the PCRA court's decision involved an unreasonable

application of <u>Strickland</u> with regard to counsel's duty to challenge the

Commonwealth's improper handling of victim Herring's sexual assault kit,  and

counsel's failure to challenge the alleged inconsistencies of the presence of semen

on  Herring's body and her  undergarments.  (Doc. 1, at 41-42; Doc. 22, at 5-10.)

The PCRA court's findings concerning the DNA evidence were adopted by

the superior court, and are as follows:

---

[5]Deoxyribonucleaic acid.  http://ghr.nlm.nih.gov/handbook/basics/dna

25

Appellant initially suggests Trial Counsel was ineffective by failing "to challenge the Commonwealth's misrepresentation of DNA evidence". Here he essentially argues the adult victim's sexual assault evidence collection kit arrived at the State Police Crime Laboratory "improperly sealed". Appellant suggests Trial Counsel should have challenged the admissibility of this evidence in contrast to that of the six year old murder victim which was "properly sealed". Appellant additionally argues that Pennsylvania State Trooper Urban's examination of the adult victim's body during the autopsy with a "forensic light source" is inconsistent with multiple deposits of semen discovered on the adult victim's clothing.

During the PCRA hearing and in response to questions posed by Appellant lead Trial Counsel, First Assistant Public Defender Albert J. Flora, Jr., Esq., indicated the forensic scientist's "ultimate report that she issued – indicates when the collection kit was received it was received in a sealed cardboard box". (PCRA N.T. page 19). More importantly, Atty. Flora stated the lack of a vigorous challenge to the collection kit was a result of Defendant's admission that he had sexual intercourse with the adult victim and ejaculated into her. (PCRA N.T. page 19). Trial counsel further stated that there was never any dispute that it was Mr. Stubbs' semen inside the victim. 'If you told us you did not have sexual intercourse with you [sic], if you told us it wasn't your semen, we would have probably taken a different approach, but that's not the defense that was raised here. There was never any dispute that that was your semen'. [footnote omitted] (PCRA N.T. page 19.)

In rejecting Appellant's apparent contention that the absence of detectable semen on the adult victim's body possessed significance Atty. Flora articulated the difference between using an alternate light source on the body for trace evidence, including semen, and searching for latent prints which the witness explained is distinct from finding semen on clothing and a pillow. "The fact of the matter is your statements to us that you had, in fact, sexual intercourse with her right around the time in which this person supposedly came in the back door. You admitted ejaculating into her. You admitted to the fact you didn't use a condom. Given what you gave us there was never any dispute that it wasn't your semen that was found". (PCRA N.T. page 23). At this juncture Appellant argued since no semen was found on the victim's body "How can it get on her clothing?" When queried by the Trial Judge as to what that demonstrated Appellant responded "It shows tampering, Your Honor. It shows the possibility of tamperance (sic) of that evidence". (PCRA N.T. page 24.)

Appellant has not only failed to demonstrate why this assertion is not waived, it clearly lacks arguable merit. Additionally, and perhaps more importantly Trial Counsel articulated a reasonable basis for not pursuing the lack of semen on the victim's body. Further, Appellant has not demonstrated how he was prejudiced. There can be no credible suggestion that the outcome of the proceeding would have been different had Trial Counsel pursued these lines of questioning.

(Doc. 21-13, at 8-10.)

Petitioner raises three specific points. He first contends that his "admission that he had sex with Mrs. Herring should not be enough to relieve trial counsel of his duty to challenge evidence that was manufactured by the Commonwealth to suggest a theory of rape to an unsuspecting jury." (Doc. 1, at 40.) Second, he argues that "just because Mrs. Herring's sexual assault kit arrived at the police crime laboratory through UPS in a cardboard box that was sealed with the same (PSP. Et) that Herring's kit was sealed with does not mean that the Commonwealth did not tamper with the evidence within the kit as a means of creating a criminal case against Petitioner, and . . . , nor does it relieve trial counsel of his constitutional duty to challenge the Commonwealth's improper handling of the evidence in connection with Herring's above evidence/kit." (Id. at 41.) Finally, he argues that "although there may be a difference between using an alternate light source on the body for trace evidence including semen, and searching for 'latent prints' which is distinct from finding semen on clothing and a pillow, latent prints are not the subject of Petitioner's claim on appeal and cannot be used to justify counsel's failure to challenge the difference between there being no semen on the outer surface of Herring's body, and the subsequent finding of semen on the

27

clothing that was removed from her body during examinations at the morgue."
(Id.)

Respondents counter that the state court findings that counsel was not ineffective were in accordance with Strickland and other applicable precedent. (Doc. 18-1, at 6.)  "At trial, the Petitioner admitted having sex with the victim; he claimed that the sex was consensual and that someone else raped and murdered the victim.  Given this admission by the Petitioner, there was no reason for trial counsel to challenge the Commonwealth's assertion that the semen found on the body was the Petitioner's, or to allege that someone had tampered with the forensic evidence. At the PCRA hearing, trial counsel testified that this was his reasonable basis for not making the objections that the Petitioner now suggests. (N.T. PCRA Hearing, pp. 23-25).  Because counsel had a reasonable ground for not challenging this testimony, he cannot be found ineffective." Id.

The facts surrounding the DNA claims are not in dispute.  Petitioner claimed that he had consensual sex with victim Herring.  When Herring's rape kit was received by the forensic scientist, it was in a cardboard box sealed with Pennsylvania State Police tape.  DNA tests confirmed the presence of petitioner's semen on the victim's nightgown and panties.  Petitioner does not challenge that it was his semen on the victim's clothing.  Petitioner's trial counsel, Attorney Flora, stated at the PCRA hearing that the lack of a vigorous challenge to the collection kit was the result of petitioner's admission that he had sexual intercourse with the victim and ejaculated into her.  (Doc. 21-13, at 9.)

28

No semen was detected by the alternate light source on any part of the victim's body.  With respect to his decision not to challenge the lack of semen on the victim's body, Attorney Flora stated that "[t]he fact of the matter is your statements to us that you had, in fact, sexual intercourse with her right around the time in which this person supposedly came in the back door.  You admitted ejaculating into her.  You admitted to the fact you didn't use a condom.  Given what you gave us there was never any dispute that it wasn't your semen."  (Id.)

Petitioner's contention that the PCRA court's decision on these issues involved an unreasonable application of Strickland is without merit.  When presented with these facts, the PCRA court, guided by the standard set forth in Strickland, concluded that petitioner was not entitled to relief.   Addressing the first prong of Strickland, the court determined that the claims lacked arguable merit and noted that trial counsel articulated a sound and reasonable basis for refusing to challenge the admissibility of the rape kit or the lack of semen detected on the victim's body.[6]  As to the second prong, the court found that petitioner failed to demonstrate prejudice and that there was no credible suggestion that the outcome of the proceeding would have been different had trial counsel pursued these claims. Because the state court's application of clearly established law was reasonable, petitioner is not entitled to relief on this claim.

---

[6]As noted *supra*, consideration of the merit of an underlying claim is considered a determinative factor in the "deficient performance" prong of the Strickland analysis.  See Werts, 228 F.3d at 203-04;  Parrish, 150 F.3d at 328.

ii.   *Evidence of Scientific Relevance*

a.        Fiber evidence

Petitioner also argues that the PCRA court unreasonably applied <u>Strickland</u> in finding that trial counsel was effective with respect to challenges to the fiber evidence. (Doc. 1, at 27-35; Doc. 22, 12-15.)

In a December 17, 2001 statement to police, Stubbs reported that during his "tryst with Mrs. Herring," he was wearing a pair of jeans, a plain white t-shirt and boots. (Doc. 1, at 53.) He was not wearing a black leather jacket, gloves, or a ski mask, and he was not carrying a blue blanket. (<u>Id.</u>) Conversely, prosecution witness Tammy Carroway testified that she witnessed Stubbs leaving the Herring residence wearing his gloves, black leather jacket and ski mask, and carrying guns wrapped in a blue blanket, which he twice attempted to place in the front seat of Mrs. Herring's vehicle before placing them in the trunk. (Doc. 1, at 53.) Stubbs contends that counsel failed to refute Carroway's testimony through fiber evidence. He specifically asserts that the jury never heard the laboratory analysis and results from Sandra M. Singer, laboratory analyst for the Pennsylvania State Police, which confirms that there were no fibers in Mrs. Herring's car consistent with "transferring from petitioner's black leather/fur lined jacket, the blue cotton fabric blanket, his gloves, or the ski mask." (Doc. 1, at 54.) He argues that "[u]nder state and federal "Relevant Evidence" rules, [he] had both a state and constitutional right to have had the above scientific evidence presented in his defense at trial where the above evidence would have made it less probable that Carroway's above

30

testimony was reliable and more probable that petitioner's statement was reliable.

The jury never heard of the above testing or results." (Id. at 54-55.)  He concludes

his argument by stating that "[h]ad trial counsel presented the scientific evidence in

question, there's a reasonable probability that, but for this unprofessional error, the

result of the proceeding would have been different where the jury would have been

exposed to scientific evidence that would have disproven the above testimony of the

Commonwealth's witness Tammy Carroway." (Doc. 1, at 61.)

The PCRA court's findings concerning the fiber evidence were adopted by

the superior court, and are as follows:

> Trial counsel forcefully and succinctly responded to Appellant's questions
> regarding fiber evidence.  The following exchange is telling:
>
> > Appellant:
> >
> > Mr. Flora, in a defense strategy to refute the trial testimony
> > of Tammy Carroway concerning her observation of what
> > she alleged to witness Mr. Stubbs wearing and carrying to
> > Mrs. Herring's vehicle and in an effort to contradict or
> > disprove that aspect of the Commonwealth's case, did you
> > utilize any scientific evidence that was provided in the
> > discovery that had the element of suggesting the contrary.
> >
> > Mr. Flora:
> >
> > Well, we had a fiber expert.
> >
> > Appellant:
> >
> > During your cross examining of Mrs. Sandra Singer, did you
> > question her on fibers that were collected and tested from
> > the front seats of Mrs. Herring's vehicle, fibers that proved
> > to be dissimilar from fibers at 5 Stark Street and the
> > accused?

Mr. Flora:

If I remember correctly, Henry, there was a substantial amount of testimony brought out as to a lot of trace evidence we recovered regarding fibers, and it was pointed out to the jury that a lot of the fibers recovered which was well over 300, that most of them were dissimilar to clothing by you and the accused - - or by you and Elena Herring. And if you want to know the reasons for that, Henry, I will tell you.

Appellant:

Great.  I'm listening, Mr. Flora.

Mr. Flora:

Had anyone actually took a close look at our expert report on the fiber evidence they would have noted that one of the things that the prosecution experts had discarded and not really looked at was the color fibers.  What was looked at was really the white fibers or the clear fibers.  Had there been a close examination of all the color fibers that were found, a much stronger association could have been drawn between you and the decedents in this case.  Fortunately for us, the prosecution experts never looked at the colored fibers.

Appellant:

The question though, Mr. Flora was fibers that Mrs. Singer testified from the front seat, both seats of Mrs. Herring's vehicle, did you at trial show the jury that none of those fibers were consistent with fibers that was found and collected from 5 Stark Street and the accused?

Mr. Flora:

The answer to that is, yes.  I think I told you that Sandra Singer testified that she examined well over 300 fibers.  And of the well over 300 fibers that she examined, I believe, there was either five or eight by which she could draw from consistency between you and the decedents.  We set the

case up where we actually were able to try and discredit Sandra Singer. I thought we did it quite effectively under the circumstances. The problem, Henry, with the fiber evidence, is that you put yourself in the house.

Appellant:

During the course of the investigation, Mr. Flora, either prior to or during the commencement of the Commonwealth's case in chief, did you review Mrs. Singer's lab report provided to you in discovery, her lab reports?

Mr. Flora:

Not only did I review her lab reports, and I think, you're talking about the trace evidence reports regarding the fibers, but I sent all of those reports to our expert.

Appellant:

Did you review her fiber worksheets?

Mr. Flora:

Her fiber worksheets were actually obtained and reviewed by our expert and, in fact, our expert couldn't testify or issue a report without those worksheets.

(PCRA N.T. pages 46-48).

Upon further questioning, Atty. Flora specifically recalled the defense questioning "a whole series of things in which there was a fiber analysis done and things were dissimilar in nature. The thing you have to understand, Henry, and our expert, I believe, also indicated this to us is the fact they don't find fiber evidence on you which is similar in nature that doesn't exclude you from committing the crime. So the mere fact that a fiber wasn't found on you that was similar to a fiber found in the car doesn't exclude you from being in the car. That's what our expert was basically telling us." (PCRA N.T. pages 49, 50.)

Atty. Flora indicated the fiber evidence presented by the prosecution was 'relatively weak'.  (PCRA N.T. page 50.)  Parenthetically, we note an examination of the trial transcript indicates Atty. Flora spent a significant period of time addressing and attacking the Commonwealth's fiber evidence during closing argument.  (Trial N.T. page 2201-2211).

(Doc. 21-13, at 12-14.)

The above excerpts of testimony from the PCRA hearing demonstrate that defense counsel formulated a strategy concerning the fiber evidence.  Defense counsel hired a scientific expert to evaluate the fiber evidence, presented that expert to the jury to testify about the meaning and significance of the evidence, conducted cross-examination of the prosecution's fiber evidence expert, and devoted a significant period of time to the evidence during his closing argument. Given these measures taken, it is concluded that the state court's application of the Strickland standard was entirely reasonable.

b. Pfaltzgraff teacup

Stubbs argues that the PCRA court unreasonably applied Strickland in finding that his argument that trial counsel was ineffective for failing to present evidence of a Pfaltzgraff teacup that was void of his saliva lacked arguable merit. (Doc. 1, at 67; Doc. 22, 12-15.)  According to Stubbs, laboratory technician Kenneth M. Mayberry testified that Mrs. Herring's saliva was found on a Pfaltzgraff teacup, lab item 70.1.  (Doc. 22, at 16.)  "But, there was another identicle [sic] Pfaltzgraff tea cup [sic] that was not presented to the jury as being a collected and tested item of evidence, nor was there any testimony provided to explain the scientific tests that was performed on the second Pfaltzgraff tea cup [sic], lab item 71.1, which tested

34

negative for saliva.  It's this Pfaltzgraff tea cup [sic] . . . that Mrs. Herring offered

Petitioner coffee in but Petitioner had declined.  Its [sic] of no coincidence that

during the investigative stage of the state's case, Petitioner stated that he was

offered coffee in which he declined and the cup was returned to the kitchen, and

than [sic] the state collected a tea cup [sic] from the crime scene kitchen sink which

tested negative for saliva."  (Id. at 17.)  It is his position that "[t]he only effective way

that trial counsel could have advocated Petitioner's assertion of being offered coffee

by Herring would have been a defense presentation of Pfaltzgraff teacup 71.1."

(Doc. 1, at 67.)

> The state court's addressed the issue as follows:
>
> The Commonwealth acknowledges DNA testing detected no trace of Mr. Stubbs' saliva on the teacup.  During the PCRA hearing Appellant represented should this evidence have been presented by the Defense "that would have proven at least that I was offered to have coffee from Mrs. Herring while I was with her, you know, and the jury should have heard this evidence from the defense".  (PCRA N.T. page 58). [When the trial court asked Attorney Flora if he had a response to the issue,] [t]rial counsel responded:

[Atty. Flora]:

>> I do, Your Honor.  There were two tea cups (sic).  Both teacups were examined by the state police laboratories. Elena Herring's saliva was found on the one tea cup (sic) that was introduced into evidence.  The other was there was no saliva found on it.  Henry in the tape recorded statement to the police indicated he did not have any coffee from the other tea cups (sic).  The jury knew two tea cups (sic) were found.  One had saliva and one didn't.  So they knew there was two tea cups (sic) there and that Henry didn't have any coffee.  So I didn't see the need of introducing the second tea cup (sic).  There's no dispute there were two tea cups (sic) found.

35

(PCRA N.T. pages 58, 59).

The transcript further reflects stand-by Counsel indicating his agreement that the teacup presented no cognizable PCRA issue. (PCRA N.T. page 59).

We fail to discern how this claim is of arguable merit. Further, Counsel's explanation is reasonable and implicates no absence of appropriate strategy. Finally, it is simply not plausible that the introduction of the Pfaltzgraff teacup would have likely changed the outcome of the trial.

(Doc. 21-13, at 15-16.)  Essentially, the state courts concluded that the teacup issue was a red herring.  Based on the record, the court agrees and concludes that the state courts did not apply the Strickland principles in an unreasonable fashion with respect to trial counsel's decision not to introduce the second Pfaltzgraff teacup into evidence.

## B.   **Brady** Violation

Stubbs contends that the state courts arrived at a decision that was contrary to federal law in failing to find a violation of Brady v. Maryland, 373 U.S. 83 (1963) when "[t]he prosecution, in bad faith, withheld [his sister, Angela Whitaker-] Mayfield's arrest warrant information so that the Commonwealth could procure perjured testimony of a seemingly reliable and credible witness."  (Doc. 1, at 79-80.)

Brady holds that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  Under Brady, evidence is considered "material" where "there is a reasonable probability that, had the evidence been disclosed to the defense, the

result of the proceeding would have been different." United States v. Bagley, 473

U.S. 667, 682 (1985).  "A 'reasonable probability' is a probability sufficient to

undermine confidence in the outcome."  Id.  To establish a Brady violation, it must

be shown that (1) evidence was suppressed; (2) the evidence was favorable to the

defense; and (3) the evidence was material to guilt or punishment.  See  United

States v. Pelullo, 399 F.3d 197, 209 (3d Cir. 2005).

Moreover, in Bagley, 473 U.S. at 676, and Giglio v. United States, 405 U.S.

150, 154 (1972), the Supreme Court clearly established that Brady "applies with

equal force to the prosecutor's failure to disclose evidence which could have been

used for impeachment purposes."  Wilson v. Beard, 589 F.3d 651, 659 (3d Cir. 2009);

see also Lambert v. Beard, 633 F.3d 126, 133 (3d Cir. 2011).

In rejecting Stubbs' claim, the state courts stated as follows:

> Appellant next argues "the Commonwealth violated the dictates of
> Brady by withholding a fugitive arrest warrant of one of its witnesses."
> Here it is argued "Angela Whittaker-Mayfield" Mr. Stubbs' sister
> "fabricated and aided the Commonwealth with forming the criminal
> element of intent".  Appellant's concise statement suggests "Angela
> Whitaker is Mayfield's maiden name" [footnote omitted].  The concise
> statement makes the additional observation "During the investigative
> stage of the Commonwealth's case, criminal background checks were
> performed on three other immediate family members of the defendant
> which included his mother who has several aliases, including the name
> Whittaker and despite the fact that the defendant's mother had
> remarried, the Commonwealth was still capable of determining that an
> arrest warrant was sought under an alias name.  Therefore, the
> Commonwealth is without excuse for failing to submit Angela Whittaker-
> Mayfield's criminal record to the defense."

> We simply note Appellant's original [PCRA] petition identifies
> Francis Guerrero of 2654 Mikle Street in Camden, New Jersey as a
> witness who would testify in support of this allegation.  As previously

stated no one other than Mr. Stubbs testified on his behalf [at the PCRA hearing] and the document, attached as Exhibit #9 to the petition, purports to be a statement by the Defendant's mother that the Defendant's sister had an outstanding fugitive warrant in New Jersey.

During the PCRA hearing stand-by counsel represented he discerned no <u>Brady</u> violation in this regard. "The question is, does Commonwealth have a deal with Ms. Mayfield. I'm not aware of anything that I've read through the trial transcript, any documents that I received that there was any proof or evidence that show there may have been a deal for her testimony which would have been a <u>Brady</u> violation. Unless Mr. Flora has anything to add to that, I would say I didn't recognize a <u>Brady</u> violation." (PCRA N.T. page 67). Atty. Flora added "I can tell you that our mitigation specialist, Lori James Monroe, she spent considerable time with the entire family and there was never an indication that a deal was cut with this woman". (PCRA N.T. page. 67). Atty. Flora also provided a lengthy response outlining why, even if an outstanding warrant existed, he would not have attempted impeached [sic]. First, the referenced witness provided positive testimony for the defense. Second, and more importantly, the defense planned to use this witness during the penalty phase should it be reached. . . .  It should be noted this witness did in fact testify on Mrs. [sic] Stubbs' behalf during the penalty phase.

(Doc. 21-13, at 19-20.)  It is clear that the state courts determined that the claim lacked merit because Stubbs failed to establish the existence of the material evidence, favorable to him, that was allegedly suppressed by the prosecution.  Such a finding is not contrary to well-established federal law.  Habeas relief may not be granted on this claim.

### C.    PCRA Court's Abuse of Discretion

Stubbs also raises the issue of "whether the PCRA court's denial of (PCRA) relief is an abuse of discretion that violates due process" in which he primarily complains about the Commonwealth's failure to comply with the PCRA court orders and takes issue with the impartiality of the PCRA court. (Doc. 1, at 7.)  In his

reply, he argues that because "neither the state courts or the Respondents' [sic] answered to this claim" it is subject to de novo review.  (Doc. 22, at 31).  While the respondents did not address this claim in their response, it is clear from a review of the state court opinions that the issue was considered.

For example, the superior court specifically observed "that this statement is merely a reiteration of the appropriate standard of review, which we will be utilizing in addressing the merits of Appellant's claims."  (Doc. 21-16, at 7-8.) Thereafter, the superior court set forth the applicable standard of review: "Our standard of review for an order denying PCRA relief is whether the record supports the PCRA court's determination, and whether the PCRA court's determination is free of legal error.  Commonwealth v. Berry, 877 A.2d 479, 482 (Pa. Super. 2005), appeal denied, 591 Pa. 688, 917 A.2d 844 (2007).  The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record. Commonwealth v. Carr, 768 A.2d 1164, 1166 (Pa. Super. 2001)."  Stubbs fails to establish that the standard upon which the superior court relied in reviewing the PCRA court's decision was either contrary to clearly established Federal law as determined by the Supreme Court of the United States, or involved an unreasonable application of such law.  28 U.S.C. § 2254(d)(1).  Nor does he establish that the state court decision was based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d)(2).  This claim is therefore without merit.

IV.    <u>Conclusion</u>

Based on the foregoing, a de novo review will be conducted with respect to the "sink traps and washer trap" claim contained in the section entitled  "Argument C) counsel's failure to present items of scientific value which would have been helpful to petitioner's defense."  (Doc. 1, at 68.)  Relief will be denied as to all other claims.

An appropriate order will issue

  S/ Christopher C. Conner   <br>
CHRISTOPHER C. CONNER<br>
United States District Judge

Dated:       September 18, 2012

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**


| | | |
|---|---|---|
| **HENRY CHRISTOPHER STUBBS, III,** | : | **CIVIL ACTION NO. 1:10-CV-1849** |
| | : | |
| **Petitioner** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **MICHAEL CURLEY, ATTORNEY** | : | |
| **GENERAL OF THE STATE OF** | : | |
| **PENNSYLVANIA,** | : | |
| | : | |
| **Respondents** | : | |

## ORDER

AND NOW, this 18th day of September, 2012, upon consideration of the

petition for writ of habeas corpus (Doc. 1), and for the reasons set forth in the

accompanying memorandum, it is hereby ORDERED that:

1. A *de novo* review will be conducted with respect to the "sink traps and washer trap" claim under the heading "Argument C) counsel's failure to present items of scientific value which would have been helpful to petitioner's defense." (Doc. 1, at 68-77.)

2. Respondents shall EXPAND the record by filing the full trial transcript on or before October 15, 2012. See R. GOVERNING § 2254 CASES R. 7(a).

3. The parties shall FILE briefs fully addressing the merits of the claim on or before November 1, 2012.

4. After submission and review of these materials, the court will determine whether an evidentiary hearing is warranted. Id. at 8(a).

5.      The petition for writ of habeas corpus (Doc. 1) will be DENIED in all
        other respects.  This does not constitute a final order for purposes of
        appeal.  A final order will be issued at the conclusion of the *de novo*
        review.


  S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge