# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **HENRY CHRISTOPHER STUBBS, III**, | : | **CIVIL ACTION NO. 1:10-CV-1849** |
| Petitioner | : | (Judge Conner) |
| v. | : | |
| **MICHAEL CURLEY, ATTORNEY GENERAL OF THE STATE OF PENNSYLVANIA,** | : | |
| Respondents | : | |

## MEMORANDUM

Petitioner Henry Christopher Stubbs, III ("petitioner"), a Pennsylvania state inmate, initiated this action with the filing of a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the following 2003 Court of Common Pleas of Luzerne County convictions: two counts of First-Degree Murder of Elena Herring ("Herring") and her six-year-old daughter, Viktoria Ivanova ("Ivanova"); Rape of Herring; Burglary; two counts of Theft by Unlawful Taking or Disposition; Robbery; Persons Not to Possess, Use, Manufacture, Control, Sell or Transfer Firearms; two counts of Access Device Fraud. (Doc. 1; Doc. 21-8, at 1.)

On September 18, 2012, the court issued its Memorandum and Order (Doc. 32) denying all claims for relief except for the "sink traps and washer trap" claim raised in petitioner's argument that counsel was ineffective in failing to present items of scientific value which would have been helpful to his defense. (Doc. 1, at 68-75.) Petitioner specifically challenged "trial counsel's ineffectiveness for his failure to present sink traps, and washing machine trap evidence as a defense

strategy to challenge the prosecutions [sic] evidence which suggested to the jury that Petitioner washed Viktoria Ivanova's blood from his hand(s), see (Petitioner's Habeas Corpus, pg. 43), and (PCRA hearing, pp. 51-54); and the prosecutions [sic] evidence which suggested to the jury that Petitioner washed Vicktoria Ivanova (the child victims [sic]) blood from his sweater, see (Petitioner's Habeas Corpus, pg. 44), and (PCRA hearing, pp. 51-54)." (Doc. 22, at 20.) (punctuation in original). Because the state court failed to address the merits of this claim, it was determined that the claim was subject to *de novo* review (Doc. 32, at 13-14). See Halloway v. Horn, 355 F.3d 707, 718-19 (3d Cir. 2004). Respondents were directed to file the full trial transcript and the parties were directed to file briefs addressing the merits of the claim on November 1, 2012. (Id. at 41.) Respondents filed a timely supplemental response. Petitioner failed to file a brief. The issue is now ripe for disposition. *De novo* review has been undertaken and, for the reasons set forth below, relief will be denied.

**I.    *De Novo* Standard of Review**

When "the state court has not reached the merits of a claim thereafter presented to a federal habeas court, the deferential standards provided by AEDPA . . . do not apply." Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001). "In such an instance, the federal habeas court must conduct a *de novo* review over pure legal questions and mixed questions of law and fact, as a court would have done prior to the enactment of AEDPA." Id. Additionally, regardless of whether a state court reaches the merits of a claim, a "federal habeas court must afford a state court's

2

factual findings a presumption of correctness and . . . the presumption applies to factual determinations of state trial and appellate courts."[1] Fahy v. Horn, 516 F.3d 169, 181 (3d Cir. 2008).

## II. Background

The following comprises the "approximate account of the facts underlying Stubbs's conviction." (Doc. 21-8, at 2.)

> In December 2001, Herring and her daughter occupied a 'double-block' building in Wilkes-Barre, the other half of which was occupied at that time by Stubbs and his mother, Frances Guerrero. The evening of December 6, Stubbs complained to his girlfriend, Tammy Carroway, that he wanted money, and that he had seen some in Herring's house. He departed, and Carroway fell asleep. At approximately 1:30 A.M., Carroway testified, she awakened to the sound of Herring's and her daughter's voice; Herring sounded as though she was pleading for her life. Silence fell, and Carroway returned to sleep.
>
> Around 2:30 A.M., Carroway awakened and went looking for Stubbs. She went outside to Stubbs's car, and set off its alarm. She then saw Stubbs running from the direction of Herring's half of the building. He was carrying firearms wrapped in a blue blanket. He placed these in Herring's vehicle and drove off. The next morning at 7:30, Stubbs returned home and awakened Carroway. He left late on the evening of December 7.

---

[1] Section 2254(e)(1) mandates that:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

3

At approximately 9:30 P.M., concerns grew when Herring did not answer her phone. Herring's brother-in-law went to her home, retrieved a hidden key, and entered the apartment. Inside, he found Herring's dead body lying on the living room floor. He found Herring's daughter's dead body hanging by the neck from the basement ceiling.

At approximately 11:00 P.M., Stubbs picked up another girlfriend, Tawanda Maddox, in Philadelphia. He immediately drove her and her children back to Wilkes-Barre, arriving at approximately 3:00 A.M. on December 8. When they arrived at Maddox's apartment she overheard Stubbs tell his brother-in-law that someone had been killed on Stubbs's mother's block. He carried into Maddox's apartment items wrapped in a blue blanket. Next, Maddox escorted Stubbs to another location, where he moved a gold vehicle. Eventually, they went to a local hotel; Stubbs still had possession of the blue blanket and its contents. A few days later, on December 12, Stubbs was apprehended by Philadelphia police on a warrant unrelated to the above-related events. Wilkes-Barre detectives drove to Philadelphia to interrogate Stubbs and then escorted him back to Wilkes-Barre.

Expert testimony established that both Herring and her daughter were killed by ligature strangulation, Herring by a shoe lace and Ivanova by hanging. Ivanova also suffered blunt-force traumas to the face. Herring had been raped at approximately the same time as she had been killed. Genetic evidence indicated that Stubbs had had recent sexual contact with Herring. He conceded that contact, but contended that it had been consensual, and that he and Herring, who was married, had been carrying on a discreet relationship. The jury found Stubbs guilty of two counts of first-degree murder, and various related charges. When the jury failed to impose the death penalty, the trial court sentenced Stubbs to two life sentences for the murders of Herring and Ivanova. On a later date, the court imposed sentences on the other charges.

(Doc. 21-8, at 2-4.)

**III. <u>Discussion</u>**

The test for ineffective assistance of counsel is a well settled and firmly established one containing two components. "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Strickland v. Washington</u>, 466 U.S. 668, 687, (1984). "Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." <u>Id</u>

Stubbs specifically challenges "trial counsel's ineffectiveness for his failure to present sink traps, and washing machine trap evidence as a defense strategy to challenge the prosecutions [sic] evidence which suggested to the jury that Petitioner washed Viktoria Ivanova's blood from his hand(s), see (Petitioner's Habeas Corpus, pg. 43), and (PCRA hearing, pp. 51-54); and the prosecutions [sic] evidence which suggested to the jury that Petitioner washed Vicktoria Ivanova (the child victims [sic]) blood from his sweater, see (Petitioner's Habeas Corpus, pg. 44), and (PCRA hearing, pp. 51-54)." (Doc. 22, at 20.) (punctuation in original).

He emphasizes that "Vicktoria [sic] Ivanova sustained injuries to her face, as was the presentation at trial. According to the laboratory analysis, a bloody area where the child was found hanging was consistent with being the child's blood type. Throughout the entire course of trial, the Commonwealth introduced and argued Ivanova's blood evidence, e.g., crime scene video, photographs, and expert and/or

5

police testimony. The presentation of Ivanova's blood evidence extended from (N.T. 179 through to N.T. 1770 plus closing argument) and was a focal point of the case." (Doc. 1, at 69.) For instance, during the trial, Dr. Herbert Leon MacDonell was called by the Commonwealth as an expert in human blood stain evidence, pattern, and interpretation, and opined that "a bloodstain pattern located on Ivanova's upper right arm and upper right shoulder was caused by a hand that was 'wet' with blood" (Id. citing N.T. 560-61; Doc. 36-1, at 54.) Dr. Michael Baden testified that there was extensive bleeding from the face and nose. "My opinion is she bled a few ounces of blood that were very prominently apparent on the floor of the basement, around her mouth and nose, going downward a little bit into the chest area, and being breathed into the lungs; but all of that would be a few ounces of blood." (Id. at 69; Doc. 36-7, at 37.) The following exchange then took place between defense counsel, Attorney Al Flora, and Dr. Baden:

> Q. In fact, there was a small pool of blood even on the floor, isn't that correct?
>
> A. Yes, including the blood on the floor.
>
> Q. And I believe there was droplets of blood going over to the place where she was actually hung from the rafters, isn't that correct?
>
> A. Yes.
>
> Q. And after she was even hung, she continued to bleed; isn't that correct?

>     A. A little bit, yes.
>
>     Q. Given that, Doctor, I take it you would expect to find some blood on the assailant; isn't that correct?
>
>     A. Probably, yes.

(Id.) Stubbs argues that, based on the testimony of Drs. MacDonell and Baden, the Commonwealth and defense counsel "established evidence of blood being on the assailant, namely, the hand(s)." (Doc. 1, at 69.) And, that through the testimony of senior forensic chemist Stephanie L. Smith, there was a distinct possibility that washing a sweater in a washing machine could lead to evidence being lost or destroyed, and the testimony of Tammy Carroway, that Stubbs demanded that his sweater be washed in the afternoon hours of December 7, 2001, the Commonwealth "created the presumption of evidence being lost or destroyed. . . ." (Id. at 70; Doc. 36-1, at 71.)

He notes that "[p]art of the investigator's search involved the collection of the kitchen sink trap and its liquid contents from the crime scene kitchen, also, the bathroom sink trap and its liquid contents from the crime scene second floor. Also in its search for blood evidence, the Commonwealth collected the washing machine trap and its liquid contents from the residence of petitioner's mother." (Doc. 1, at 69-70.) However, "during the defense cross examination of Commonwealth witness Sandra M. Singer, defense failed to question her on Commonwealth evidence that she tested for the presence of blood; namely, the sink traps that were collected from the crime scene, the washing machine trap that was collected from petitioner's

7

mother's residence, and petitioner's gloves. The above items tested negative for presence of blood. . . . The jury never heard that any of the above items were collected as evidence or of the negative results for blood evidence." (Doc. 1, at 71.)

In addition, he argues that "counsel, being unprepared, elicited damaging testimony [from Sandra M. Singer] which gave support to the Commonwealth's argument when trial counsel asked the lab technician: Q. Would you agree with me that there are studies which exist which particularly indicate the circumstances under which blood may or may not be washed out of a fabric given the nature of the fabric, whether chlorine is used or not, and whether hot water is used or not, plus the drying time? A. Yes, there are studies. (N.T. 1489)." (Doc. 1, at 73.)

### A. Counsel's performance

In analyzing the first prong of the <u>Strickland</u> test, there is a strong presumption that counsel performed reasonably. <u>Id.</u> (citing <u>Strickland</u>, 466 U.S. at 689). Thus, counsel's performance will be deemed deficient only if it "fell below an objective standard of reasonableness" with reasonableness being judged under professional norms prevailing at the time counsel rendered assistance. <u>Id.</u> at 688. The question ultimately is "whether, in light of all the circumstances, the [challenged] acts or omissions were outside the wide range of professionally competent assistance." <u>Id.</u> at 690. In the first instance, Stubbs has failed to overcome the presumption that counsel performed reasonably.

It is Stubbs' position that "trial counsel knew the nature and contents of petitioner's claim" and that his failure to present the lack of blood evidence in the

8

sink and washer traps through the testimony of Commonwealth expert witness Sandra M. Singer fell below an objective standard of reasonableness. (Doc. 1, at 72.) At the time of trial, Sandra M. Singer ("Singer"), was employed as the crime laboratory manager with the Pennsylvania State Police Crime Lab in Wyoming, Pennsylvania. (Doc. 36-6, at 26.) She holds a bachelor of science degree in chemistry and a master of science in forensic science and testified as an expert in the fields of serology (the analysis, identification, and comparison of body fluids), forensic fiber analysis, and forensic hair analysis. (Doc. 36-6, at 26-30.) At the PCRA hearing, the issue was raised in the following manner:

> Mr. Menn (PCRA counsel for Stubbs): On that same line, I think, Mr. Stubbs' request is because Dr. MacDonell testified that there was a handprint of some type or a hand smear on the body that assuming the Defendant was a party that would have actually made that smear on the body that there would have been some blood on something. Whether it was gloves that would have come off that would have been on him at the time he left the premises or blood through a sink trap or something, if he washed his hands prior to putting his hand in the glove.
>
> He wants to know in this was any examination of witnesses with regards to that or any expert testimony discerned from that either from your testing through an independent party or whether through the Commonwealth's case?
>
> Mr. Flora (Trial counsel for Stubbs): I think through the Commonwealth's case, I don't think there was any evidence to show that there was any blood found on his sweater or on his jacket or on his gloves. So we're not going to sit there and be in a position to prove something the Commonwealth is not establishing.
>
> In other words, if they're walking in and they're taking the position that we didn't find any blood on his stuff, why are we getting an expert to challenge that?

9

(Doc. 21-12, at 14-15.) In scrutinizing counsel's performance, the court must be highly deferential. Strickland, 466 U.S. at 689. As recognized in Strickland:

> [I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. Engle v. Isaac, 456 U.S. 107, 133–134, 102 S.Ct. 1558, 1574–1575, 71 L.Ed.2d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' See Michel v. Louisiana, supra, 350 U.S., at 101, 76 S.Ct., at 164. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

Strickland, 466 U.S. at 689.

In light of the Commonwealth's case-in-chief, which did not adduce blood evidence connected to Mr. Stubbs' clothing, the court concludes that Attorney Flora had a reasonable basis for not questioning Singer on the lack of blood evidence in the sink and washer traps. Given the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," Strickland, 466 U.S. at 689, Stubbs has failed to show that Flora's representation fell below an objective standard of reasonableness.

Stubbs also argues that Attorney Flora acted unreasonably when he elicited the following "damaging testimony" from Singer:

10

> Q. You indicated that you examined the green sweater and you found no blood in the green sweater, correct?
>
> A. Yes.
>
> Q. Did any member of the District Attorney's Office contact you and ask you under what circumstances can blood be washed out of that particular fabric?
>
> A. No.
>
> Q. Would you agree with me that there are - - strike that. Did you render any type of opinion to the District Attorney's Office addressing that issue?
>
> A. No.
>
> Q. Would you agree with me that there are studies which exist which particularly indicate the circumstances under which blood may or may not be washed out of a fabric given the nature of the fabric, whether chlorine is used or not, plus the drying time?
>
> A. Yes there are studies.

(Doc. 36-6, at 57.) This exchange was specifically addressed during Stubbs' PCRA proceedings. During the PCRA hearing, Stubbs raised the concern of "whether there was any testimony or cross examination or testing done by an expert on behalf to the defense to show if any blood existed either on the gloves, the sweater or any blood existed in sink traps or washer traps that may have shown that blood had been washed off from him or his hands or was on any of his clothing." (Doc. 21-12, at 14.) Attorney Flora responded as follows:

11

> I don't think there was any evidence to suggest that any blood was found on any clothing. I know the prosecution didn't present any evidence to the effect. I think what you're eluding [sic] to is a question that I may have posed to Sandra Singer where I said to her - - and it might have been at the very end of cross examination - - where I asked her, Is there studies which would indicate whether or not blood can be washed out of a sweater, drying times, things of that nature?
>
> Unfortunately, many people misinterpreted that question. That question was really designed to raise people thinking as to whether, in fact, there is a way you can do a post-wash testing to determine whether, in fact, blood or some type of stain can be washed out of a garment, and this is post-wash testing. I'm not aware of any such studying existing or whether any such test even exists, but unfortunately, people will take that question and extrapolate it to the next level.
>
> Are there studies out there to indicate you can take a particular garment and wash it and remove a stain? Sure. Just buy a bottle of Resolve or a bottle of Tide and just look at the description on the back. You don't need studies for this. This is commonsense. You can take Resolve and put it on a stain and then you can wash it out of your clothes. That's not expert testimony.
>
> So essentially the question the way it was posed is trying to get the people to think that prior to washing, sure, stains can be removed, but going to the next level, is there some type of test can be done after a garment is washed. I'm not aware of any such test.

(Id.)

It is evident that Attorney Flora had a sound and reasonable trial strategy for engaging in this line of questioning; he was attempting to establish that Singer had failed to conduct a certain test or that no such test existed. This theme was present throughout the whole of cross examination. Attorney Flora consistently and effectively highlighted various tests and scientific studies that were: (1) available but not performed; (2) not performed in the manner dictated by Pennsylvania State Police protocol; or (3) not performed in accordance with generally accepted

12

scientific guidelines.[2] (Doc. 36-6, at 43-57.) A thorough review of the trial transcript reveals that counsel's cross-examination of this witness, which called into question the facts underlying the witnesses' expert conclusions on the fiber evidence, was within applicable standards of competency. Courts are to refrain from second guessing "counsel's discretionary decisions that are 'well within the range of

---

[2]For instance, trial counsel elicited from Singer that approximately three hundred fibers were collected, and the only relevant fibers were four red acrylic and four white acrylic fibers. (Id. at 56). Four red acrylic fibers were collected from the couch at the victims' residence, from Herring's nightgown, from a pair of Ivanova's underwear, and from a green sweater worn by Stubbs. (Doc. 36-6, at 52). Singer concluded that the fibers found at the residence and on the victims' clothing, were microscopically similar to the red fiber found on Stubbs' green sweater, but acknowledged that, even though they were microscopically similar, the fibers could have come from any of seven different subclassifications. (Id. at 51-52.) The same issue was true of the white acrylic fibers found on Stubbs' green sweater. (Id. at 53-54.) Singer also acknowledged that additional testing was necessary concerning fiber subclassifications and that she was not qualified to conduct such an analysis. (Id. at 51-53.) Therefore, she forwarded the fibers to the Pennsylvania State Police trace laboratory in Harrisburg as they have the ability to perform chemical and instrumental fiber testing that is not available at her lab. (Id. at 35-36.) However, in the process, she failed to alert them that testing should be done to determine the subclassifications of the red or white acrylic fibers. (Id. at 52-53.) Trial counsel established that in not conducting these analyses, the state police failed to follow their own protocols (that a combination of methods be employed to extract the greatest potential for discrimination between samples), and that this failure precluded an expert opinion from being rendered on the issue of whether the red or white fibers, though microscopically similar, fell into different subclassifications. (Id. at 54.)

With regard to a hole in the left side of Stubbs' green sweater, Singer agreed that fiber analysis may include an examination of a piece of fabric to determine whether any tears in the fabric are the result of normal usage or some other etiology. (Doc. 36-6, at 57.) She did not know if someone in the Harrisburg laboratory was trained to conduct such a test. (Id.) She did, however, concede that she did not make recommendations to anyone in Harrisburg to conduct such an examination.

13

professionally reasonable judgments.' " United States v. Gordon, 335 F. App'x. 236, 239 (3d Cir. 2009), quoting Strickland, 466 U.S. at 699.

### B. Prejudice

Even if it Attorney Flora's performance was deemed objectively unreasonable, Stubbs has failed to demonstrate prejudice. He argues that "there's a reasonable probability that, but for counsel's unprofessional errors; failing to present the above scientific evidence, [the absence of blood in the sink and washer traps], and elicitation of damaging testimony from Sandra Singer, the result of the proceeding would have been different where the jury would not have been left to believe the petitioner washed blood evidence from his sweater and hand, blood that belonged to the child victim." (Doc. 1, at 75.)

Prejudice is established by demonstrating that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. In accepting the state courts' factual findings[3], which sets forth in detail the overwhelming evidence of guilt, this Court concludes that Stubbs fails to demonstrate that a different outcome would likely have resulted, or that "counsel's errors were so

---

[3] A state court's factual findings must be afforded a presumption of correctness, which applies equally to factual determinations of state trial and appellate courts. Fahy, 516 F.3d at 181.

14

serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687. (See also, Docs. 21-13, 21-16.)

## IV. Conclusion

Based on the foregoing *de novo* review of the "sink traps and washer trap" claim contained in the section entitled "Argument C) counsel's failure to present items of scientific value which would have been helpful to petitioner's defense," (Doc. 1, at 68-75) the claim is denied.

## V. Certificate of Appealability

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability ("COA"), an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A COA may issue only if the applicant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322 (2003)). Here, jurists of reason would not find the disposition of this case debatable. However, petitioner is advised that he has the right for thirty (30) days to appeal our order denying his petition, see 28 U.S.C. § 2253(a); FED. R.APP. P. 4(a)(1)(A), and that our denial of a certificate of appealability does not prevent him from doing so, as long as he seeks, and obtains, a certificate of appealability from the court of appeals. See FED. R.APP. P. 22.

An appropriate order will issue.

                                              S/ Christopher C. Conner
                                              CHRISTOPHER C. CONNER
                                              United States District Judge

Dated:        February 28, 2013

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **HENRY CHRISTOPHER STUBBS, III,** : | CIVIL ACTION NO. 1:10-CV-1849 |
| Petitioner : | (Judge Conner) |
| v. : | |
| **MICHAEL CURLEY, ATTORNEY GENERAL OF THE STATE OF PENNSYLVANIA,** : | |
| Respondents : | |

## **ORDER**

AND NOW, this 28th day of February, 2013, upon consideration of the petition for writ of habeas corpus (Doc. 1), and for the reasons set forth in the accompanying memorandum, as well as the memorandum and order issued on September 18, 2012 (Doc. 32), it is hereby ORDERED that:

1. The petition for writ of habeas corpus (Doc. 1) is DENIED.

2. The Clerk of Court is directed to CLOSE this case.

3. There is no basis for the issuance of a certificate of appealabilty. See 28 U.S.C. § 2253(c).

   S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge